**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| **ANA MARÍA LÓPEZ-ERQUICIA**<br><br>**Plaintiff**<br><br>**v.**<br><br>**ÁNGELA WEYNE-ROIG, et al.**<br><br>**Defendants.** | **CIVIL NO. 13-1915 (GAG)** |

## <u>MEMORANDUM OPINION</u>

Plaintiff, Ana María López-Erquicia ("Plaintiff"), commenced this action against Ángela Weyne-Roig ("Weyne"), in her personal and official capacity as Commissioner of the Office of the Insurance Commissioner of Puerto Rico, and the Office of the Insurance Commissioner (the "OIC") (collectively "Defendants"). Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging violations of the First and Fourteenth Amendments of the U.S. Constitution. Plaintiff also brings state claims alleging violations of Article II of the Constitution of the Commonwealth of Puerto Rico, §§ 1, 2, 4, 6 and 7; and Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. tit. 31, §§ 5141 and 5142.

Presently before the court is Defendants' motion for summary judgment. (Docket No. 60.) Plaintiff opposed Defendants' motion. (Docket Nos. 83.) Thereafter, Defendants filed a reply brief. (Docket No. 86.)

After reviewing the submissions and the pertinent law, the court **GRANTS in part and DENIES in part**, Defendants' motion for summary judgment. (Docket No. 60.)

Civil No. 13-1915 (GAG)

## I.    Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); see Fed. R. Civ. P. 56(a). "An issue is genuine if 'it may reasonably be resolved in favor of either party' at trial, . . . and material if it 'possess[es] the capacity to sway the outcome of the litigation under the applicable law.'" Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006) (alteration in original) (internal citations omitted).  The moving party bears the initial burden of demonstrating the lack of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325.  "The movant must aver an absence of evidence to support the nonmoving party's case.  The burden then shifts to the nonmovant to establish the existence of at least one fact issue which is both genuine and material." Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  The nonmovant may establish a fact is genuinely in dispute by citing particular evidence in the record or showing that either the materials cited by the movant "do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."   Fed. R.Civ. P. 56(c)(1)(B).  If the court finds that some genuine factual issue remains, the resolution of which could affect the outcome of the case, then the court must deny summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party and give that party the benefit of any and all reasonable inferences.  Id. at 255.  Moreover, at the summary judgment stage, the court does not make credibility determinations or weigh the evidence.  Id.   Summary judgment may be

Civil No. 13-1915 (GAG)

appropriate, however, if the nonmoving party's case rests merely upon "conclusory allegations, improbable inferences, and unsupported speculation." <u>Forestier Fradera v. Mun. of Mayaguez</u>, 440 F.3d 17, 21 (1st Cir. 2006) (quoting <u>Benoit v. Technical Mfg. Corp.</u>, 331 F.3d 166, 173 (1st Cir. 2003)).

**II.    Non-moving party's Opposition to Summary Judgment and Additional Statement of Facts**

As a threshold matter, the court notes Defendants failed to file an accompanying Opposition to Plaintiff's Statement of Additional Uncontested Material Facts. (Docket No. 75.)

Local Rule 56 governs summary judgment practice before the U.S. District Court of Puerto Rico. L.Cv.R. 56. Local Rule 56 provides, in part, that:

> A party replying to the opposition to a motion for summary judgment shall submit with its reply a separate, short, and concise statement of material facts which shall be limited to any additional facts by reference to the numbered paragraphs of the opposing party's statement of material facts. Unless a fact is admitted, the reply shall support each denial or qualification by a record citation as required by subsection (e) of this rule.

L.Cv.R. 56(d).

In addition, Local Rule 56 states: "Facts contained in a supporting or opposing statement of material facts, if supported by records citations as required  by this rule, shall be deemed admitted unless properly controverted." <u>Id.</u>  The First Circuit has made it clear that a party, who ignores any provision of Local Rule 56, does so "at their peril." <u>Ruis Rivera v. Riley</u>, 209 F.3d 24, 28 (1st Cir. 2000).  This court and the First Circuit have both held the court will be justified from deeming admitted a party's submitted uncontested facts, where the other party fails to file an opposition admitting, qualifying, or denying such statements. <u>Fontanez-Nunez v. Janssen Ortho LLC</u>, 447 F.3d 50, 55 (1st Cir. 2006);  <u>see also</u> <u>Gonzalez-Rodriguez v. Potter</u>, 605 F. Supp. 2d 349, 357 (D.P.R. 2009).

Civil No. 13-1915 (GAG)

Because Defendants failed to file an accompanying Opposition to Plaintiff's Statement of Additional Uncontested Material Facts in accordance with Local Rule 56, this court will deem admitted all properly supported factual assertions contained in Plaintiff's Statement of Additional Uncontested Material Facts.  (Docket No. 75.)

### III.    Relevant Factual and Procedural Background

The court states the facts in the light most favorable to Plaintiff.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Plaintiff began working at the OIC in 1996.  (Docket No. 75 ¶ 4.)  Since then, she has held numerous career and trust positions with the OIC.  (Id. ¶ 5-7, 11-12, 15.)  She first started as Attorney at the Legal Affairs Division, and was later promoted to Principal Attorney.  (Id. ¶ 4-5.) In 2004, she was again promoted to the career position of Director of Anti-Fraud Special Investigations ("AFSI") within the Legal Affairs Division of the OIC.  (Id. ¶ 6-7.)

Plaintiff is affiliated to the New Progressive Party ("NPP") and has served as an electoral polling officer for the NPP General Elections.  (Id. ¶ 1.)  It is common knowledge at the OIC that Plaintiff belongs to the NPP.  (Id. ¶ 38.)  On April 2009, during the administration of New Progressive Party's ("NPP") Governor Luis Fortuño-Burset, Plaintiff received a trust appointment as Chief Deputy Commissioner of the OIC, under former Commissioner of the OIC and NPP political appointee, Ramón Cruz-Colón.  (Id. ¶ 12.)  Under this position, Plaintiff was the second in-charge in the OIC.  (Id. ¶ 14.)  From April 2009 to January 1, 2013, Plaintiff occupied the trust position of Auxiliary Commissioner in Legal Affairs and Deputy Commissioner of the OIC.  (Id. ¶ 15.) On January 1, 2013, she was then reinstated to her career position as Director of the AFSI. (Id. ¶ 18.)

Civil No. 13-1915 (GAG)

In the General Election of 2012, Alejandro García Padilla of the Popular Democratic Party ("PDP") won the election over incumbent NPP Governor, Luis Fortuño-Burset.  (Id. ¶ 25-26.) Weyne was appointed by incoming Governor García-Padilla as the new Insurance Commissioner of the OIC.  (Id. ¶ 27.)  It is uncontested that Weyne is a supporter of the PDP, thus, Plaintiff and Weyne are of opposing political affiliations.  (Id. ¶ 30-31.)  Employees of the Legal Division of the OIC discuss politics, and make known to everyone else their respective political affiliations. (Id. ¶ 39.) Employees belonging to opposing political parties, usually do not sit together during lunchtime, a practice that Plaintiff alleges became more prevalent when Weyne assumed the position of Commissioner.  (Id. ¶ 37.)

On January 2, 2013, Weyne assumed the position of Commissioner and requested Plaintiff to meet with her.  (Id. ¶ 33.)   The next day, in that meeting, Weyne told Plaintiff that because Plaintiff was not of her political trust, "things would be changing."  (Id. ¶ 35.)  Plaintiff then asserted that her position as Director of the AFSI was a career position, and that she wanted to continue providing services with excellence. (Docket No. 75 ¶ 36.)  Before Weyne arrived at the OIC, Plaintiff had not received any sort of disciplinary measure throughout her career in the OIC. (Id. ¶ 17.)  It is also uncontested that Plaintiff has never received a negative evaluation as to her work performance throughout her career in the OIC.  (Id. ¶ 16.)

On May 29, 2013, Weyne sent Plaintiff a letter notifying her that the AFSI division would be eliminated, and its employees would be assigned to the Market Conduct ("MC") Division. (Docket Nos. 60-1 ¶ 1; 75 ¶ 77.)  Plaintiff then was reclassified to the position of "Principal Attorney" and assigned to the Legal Affairs Division.  (Docket Nos. 60-1 ¶ 1; 75 ¶ 1.)   The letter notified Plaintiff that she could request an informal administrative hearing within five (5) days from the date she received the letter.  (Docket No. 75 ¶ 79.)  Four (4) days after receiving the

Civil No. 13-1915 (GAG)

letter, on June 3, 2013, Plaintiff's position was changed from Director of the AFSI to "Principal Attorney" at the Legal Affairs Division.  (Id. ¶ 80.)  The OIC Regulations provide that a demotion be notified to the employee with at least thirty (30) days' notice.  (Docket Nos. 75 ¶ 81;  88-3 at 3-4.)  OIC Regulations provide that in the event a career position is eliminated, the employee be transferred to a similar position to the one she held.  (Docket No. 75 ¶ 82.)  OIC Regulations define a demotion was a change of employment to a job in another class with basic salary of a lower level.  (Id. ¶ 83)  The position of Principal Attorney is one of lower rank and lower salary scale than the position of AFSI Director.  (Docket Nos. 75 ¶ 84-85; 76 ¶ 1.)

Weyne states that Plaintiff's transfer stemmed from an effort to maximize agency resources because Weyne decided to eliminate the position in the AFSI Division, and assign all those employees to the MC Division.  (Docket No. 60-2 ¶ 1.)  Weyne argues this decision had "absolutely nothing to do with partisan politics." (Docket No. 75-10 at 19 ¶ 3.)  However, Plaintiff denies that the "reclassification" was to "maximize agency resources" since Weyne told Plaintiff during the January 3, 2013 meeting that because she did not hold her political confidence, "things would be changing."  (Docket No. 75 ¶ 35.)

Weyne further asserts the elimination of the AFSI unit was not the only change made, citing also another consolidation of other departments such as consolidating the commissaries of administrative services and customer services.  (Docket No. 60-1 ¶ 12.)  Plaintiff, on the other hand, offered deposition testimony from the OIC's Director of Human Resources and Employee Relations, who stated that the only major change as a result of the reorganization that took place was the elimination of the Anti-Fraud Division and its consolidation with the MC Division. (Docket No. 76 ¶ 12.)

Civil No. 13-1915 (GAG)

Weyne states she decided in April 2013 that the AFSI division was no longer as active, and she wanted to expand the scope of the MC division, thus, she moved personnel around where she understood them to be more useful.  (Docket No. 60-1 ¶ 14-15.)  Weyne claims she relied upon the opinion of Human Resources personnel regarding what to do with the AFSI division and its personnel once the agency was consolidated.  (Docket No. 60-1 ¶ 17.)  Plaintiff once again asserts Weyne had decided to demote Plaintiff long before April 2013, as evidenced by the January 3, 2013 meeting, in which Weyne told her that she was a Director that did not hold her political confidence and that "things would be changing."  (Docket No. 75 ¶ 35.)  Except for Plaintiff, no other employee at the OIC was transferred to a lower ranked position with a lesser salary scale as a result of Weyne's reorganization.  (Docket No. 76 ¶ 14.)

Specifically as to the decision to reassign Plaintiff to the Principal Attorney position, Weyne stated that it was a "position that would be consonant with her knowledge and her previous work at the office."  (Docket No. 75-2 at 9.)  Nevertheless, Plaintiff claims that the result of Weyne's reorganization was that Plaintiff was the only career employee adversely affected by the change, with a demotion to a position of lower rank and salary range.  (Docket No. 76  ¶ 17.)  Additionally, the last time Plaintiff held the "Principal Attorney" position was 11 years ago, in 2004.  (Docket No. 75 ¶ 86.)

As established above, Plaintiff claims Weyne's characterization of her transfer as "reclassification" is misleading, and instead her transfer should be described as a "demotion." (Docket No. 76 ¶ 1.)  It is uncontroverted that upon being reclassified to the position of "Principal Attorney," Plaintiff retained her same salary and fringe benefits.  (Docket Nos. 60-1 ¶ 3; 60-3 at 6-7.)  Plaintiff's position as Director of the AFSI, yielded a monthly salary of $7,543.00.  (Docket No. 75 ¶ 18.)  According to the Career Service Position and Compensation Plan, the position of

7

Civil No. 13-1915 (GAG)

AFSI Director is comprised in the Managerial Band, Zone 2, with a monthly retribution scale that ranges from $4,000.00 to $6,205.00 and an extended monthly retribution scale that ranges from $6,516.00 to $10,108.00.  (Id. ¶ 89.)   The position of Principal Attorney is comprised in the Managerial Band, Zone 3, with a monthly retribution scale that ranges from $3,475.00 to $5,391.00 and an extended monthly retribution scale that ranges from $5,660.00 to $8,781.00. (Id. ¶ 88.)

On one hand, the Career Service Position and Comparison Plan states the duties of the AFSI Director are (1) to develop norms, procedures and make official interpretation of regulations and statutes concerning her division; (2) as far as the personnel under her command, implement, supervise and evaluate the areas of recruitment, selection, training, development, performance and disciplinary actions; (3) substitute the Deputy Commissioner when so required; (4) be responsible for enacting and implementing the agency's annual work plan for the AFSI; (5) plan, coordinate and direct the analysis of violations of the Insurance Code of Puerto Rico; (6) supervise all suspicious/fraudulent insurance claims; (6) supervise the entire investigation process and analyze relevant data for investigative claims; (7) analyze all relevant findings in order to determine how to proceed; (8) keep files of assigned investigations in a confidential and organized manner; and (9) serves as liaison with federal, state, municipal and private agencies, as well as testify in administrative and judicial proceedings.  (Docket Nos. 60-1 ¶ 23; 75 ¶ 24; 88-1 at 13.)  The AFSI Director worked under the supervision of the Auxiliary Commissioner of Supervision and Compliance, who gives out specific instructions for the performance of her work.  (Docket No. 75 ¶ 22.)  It is uncontested that party affiliation is not an appropriate requirement for the position of AFSI Director.  (Id. ¶ 8.)  The position of AFSI Director is a career position.  (Id. ¶7.)

Civil No. 13-1915 (GAG)

On the other hand, the duties of the Principal Attorney are: (1) to plan, coordinate and supervise the work of personnel with lower seniority; (2) offer legal advice to officers and employees of the OIC; (3) provide orientation and training to the legal personnel of lower seniority; (4) perform studies and analysis and makes recommendations on legal matters; (5) participates in administrative or state litigation; (6) substitute the Director of Legal Affairs when required, (7) interview employees, officers and other parties involved in cases under investigation, among other duties.  (Docket Nos. 60-1 ¶ 5; 75 ¶ 90; 88-1 at 9.)  However, Plaintiff claims she no longer performs supervisory functions as Principal Attorney, she is treated differently at the OIC compared to other employees, and she almost has no case load or is consulted anything with regards to the administration of the Legal Division.  (Docket No. 76 ¶ 5.)

Plaintiff also claims Weyne "harassed" her and treated her in a discriminatory manner in multiple occasions. For instance, in January, Weyne asked all employees in her section to exhaust excess vacation leave.  (Docket No. 60-1 ¶ 6.)  On January 4, 2013, Plaintiff sent Weyne an email requesting to exhaust all forty (40) days of accumulated, excess vacation leave beginning January 15, 2013 until March 13, 2013.  (Docket No. 75 ¶ 42.) Weyne rejected the proposal, and instead ordered Plaintiff to exhaust her accrued vacation leave two to three days at a time on a weekly basis.  (Id. ¶ 43.)  When Plaintiff demanded an explanation as to why she was being asked to exhaust vacation leave in this manner, when allegedly none of the other employees had to, Weyne responded to something of the effect "that's how political matters are" or "you know how this political things are."  (Id. ¶ 44.)  Subsequently, for the next five months, Plaintiff had to submit weekly requests for Weyne's approval in order to exhaust her accrued vacation leave.  (Id. ¶ 45.) Plaintiff claims that during those five months, Weyne would assign her numerous tasks and works, and demanded that Plaintiff submit reports and the results of assignments with hardly any time to

Civil No. 13-1915 (GAG)

complete them.  (Id. ¶ 46.)  Plaintiff claims in one occasion Weyne reprimanded her through an email she copied to the president of an insurance company.  (Id. ¶ 47.)  Plaintiff also claims that whenever she would meet with Weyne after exhausting her vacation leave, Weyne would state to Plaintiff in a sarcastic manner: "Are you enjoying this?"  (Docket Nos. 75 ¶ 48; 60-1 ¶ 11.) Plaintiff asserts that Weyne wrote e-mails using unspecified "harsh words" and during meetings referred to plaintiff as the agency's "historical memory."  (Docket No. 60-1 ¶ 11.)

On June 28, 2013, Plaintiff was served at the OIC with a civil lawsuit for decisions she made while serving as deputy commissioner of the OIC.  (Docket No. 75 ¶ 128.)  As it was customary in the OIC for many years, Plaintiff proceeded to complete a request for Law 9 benefits to obtain legal representation from the Puerto Rico Department of Justice.  (Id. ¶ 144.)  The sample letter and sworn statement utilized to request Law 9 benefits for OIC personnel is found in the servers of the OIC's legal division.  (Id. ¶ 140.)  Plaintiff completed her request for Law 9 benefits on the same day that she was served with process with the assistance and authorization of the acting Director of the Legal Affairs Division, attorney Brenda Perez-Fernandez.  (Id. ¶ 145.)  The process of requesting Law 9 benefits was common practice in the OIC, and Attorney Perez-Fernandez had done this on many occasions.  (Id. ¶ 143.)  Weyne was aware that Plaintiff had requested Law 9 benefits before.  (Id. ¶ 154.)

On July 1, 2013, Plaintiff learned that the OIC would not process the Law 9 benefits request, whereupon Plaintiff went to the Department of Justice to process it personally.  (Id. ¶ 147.)  On July 3, 2012, Plaintiff received a letter signed by Weyne, notifying her of the intent to suspend her for thirty (30) days without pay for her actions of completing a request for Law 9 benefits during working hours with the help of personnel and property of the OIC.  (Id. ¶ 148.) Plaintiff asserts there is no regulation, letter or any document in the OIC which states which

Civil No. 13-1915 (GAG)

process should be followed to request Law 9 benefits.  (Docket Nos. 75 ¶ 149; 76 ¶ 7.)  There is however, a general regulation not to utilize OIC computers or equipment for personal matters.  (Id. ¶ 152.)  Weyne stated Plaintiff was suspended from employment for using agency resources and time for a personal endeavor and, although she requested an administrative hearing to challenge the decision, she failed to appear to the same based on advice by her counsel.  (Docket Nos. 60-1 7; 60-3 3-5.)  Plaintiff asserts no OIC employee had ever been sanctioned at the OIC for requesting Law 9 benefits before.  (Docket Nos. 75 ¶ 153; 75-3 at 19.)  Ultimately, Weyne decided to impose a sanction against Plaintiff from salary and employment for thirty days.  (Docket Nos. 75 ¶ 156; 88-20 at 1.)

Presently, Plaintiff remains at the Legal Affairs Division, in the position of Principal Attorney.  (Docket No. 75 ¶ 86).

## IV.    Discussion

As noted above, Plaintiff asserts violations of the First and Fourteenth Amendments to the U.S. Constitution, and violations of Article II of the Constitution of Puerto Rico, §§ 1, 2, 4, 6 and 7 and Articles 1802 and 1803 of the Civil Code, P.R. LAWS ANN. tit. 31, §§ 5141 and 5142.

In moving for summary judgment, Defendants first argue Plaintiff's Due Process rights were not violated because she has not been terminated, and thus, no notice nor a hearing had to be provided before transferring her to a new position.   (Docket No. 60 at 4-5.)   Second, Defendants assert that Plaintiff has failed to prove a prima facie case of political discrimination because Plaintiff did not suffer a materially-adverse employment action.  (Id. at 6-13.)   In the alternate, but still related to the political discrimination claim, Defendants also assert that the changeover defense, and the Elrod-Branti exception allowed Weyne to transfer Plaintiff to

11

Civil No. 13-1915 (GAG)

another position even if politics played a part in her decision. (Id. at 13-22.) Lastly, Defendants assert that Weyne is entitled to qualified immunity. (Id. at 22-24.)

Plaintiff opposes, first arguing that because she suffered a demotion, Defendants had to provide her with adequate notice and hearing before demoting her, which they failed to do. (Docket No. 77-1 at 12-19.) Second, Plaintiff contends she has suffered an adverse employment action, and successfully established a *prima facie* case of political discrimination, based on her demotion to the position of Principal Attorney, coupled with evidence of Weyne's political animus. (Id. at 20-25.) Next, Plaintiff asserts that the changeover defense and the Elrod-Branti exception do not relieve Defendants of liability, since her position as the AFSI Director at the OIC has always been regarded a career position, and Defendants have maintained throughout this litigation that her transfer to a new position had nothing to do with political matters. (Id. at 26-35.) Lastly, Plaintiff asserts Weyne is not entitled to qualified immunity because Weyne cannot reasonably claim she was unaware that she was violating Plaintiff's rights when she demoted Plaintiff to the position of Principal Attorney in account of her political affiliation. (Id. at 35-39.) The court will discuss each claim in turn.

A.  Due Process

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. CONST. amend. XIV. This due process guarantee has both procedural and substantive aspects. See Parker v. Hurley, 514 F.3d 87, 101 (1st Cir. 2008). To succeed on a procedural due process claim, a plaintiff must show that he was deprived of a life, liberty, or property interest without the requisite minimum measure of procedural protection warranted under the circumstances. See Romero-Barceló v. Hernández-Agosto, 75 F.3d 23, 32 (1st Cir. 1996).

Civil No. 13-1915 (GAG)

A viable procedural due process claim must demonstrate a "deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' . . . without due process of law." Id. 75 F.3d at 32 (citations omitted).  "The Due Process Clause of the Fourteenth Amendment protects government employees who possess property interests in continued public employment." Ruiz-Casillas v. Camacho-Morales, 415 F.3d 127, 134 (1st Cir. 2005) (citing Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)).  To determine whether public employees possess such a property right, the First Circuit requires that the court examine local law and the terms and conditions of the employment arrangement. Ruiz-Casillas, 415 F.3d at 134.

Under Puerto Rico law, career employees have a property interest in their continued employment. Garnier v. Rodriguez, 506 F.3d 22, 27 (1st Cir. 2007) (citing González-de-Blasini v. Family Dept., 377 F.3d 81, 86 (1st Cir. 2004)).  Due process requires that prior to a deprivation of life, liberty, or property the individual being deprived of said interest be given notice and an opportunity for a hearing.  See Herwins v. City of Revere, 163 F.3d 15, 18 (1st Cir. 1998) (citing Memphis Light, Gas and Water Div. v. Craft, 436 U.S. 1, 19 (1978)). The "root requirement" is that an individual be given an opportunity to be heard before he is deprived of any significant property interest.  See Loudermill, 470 U.S. at 542 (quoting Boddie v. Connecticut, 401 U.S. 371, 379 (1971)).

In the present case, Defendants agree that Plaintiff had a property interest in her career position.  However, Defendants contend that Plaintiff was never deprived of such property interest because she was not terminated, and instead she was re-assigned to a new position.  (Docket No. 60 at 5.)  In turn, Plaintiff argues that a demotion occurred when she was reclassified to the career position of Principal Attorney, because the new position is of lower rank, lower pay scale, and lesser job responsibilities.  Plaintiff asserts that under Puerto Rico law, a demotion is considered to

Civil No. 13-1915 (GAG)

be a deprivation of the employee's property interest in continued employment and thus Defendants owed her a pre-termination hearing before the change in position occurred.  (Docket No. 77-1 at 14.)

The First Circuit has recognized that the scope of the property interest extends only to the position itself, not to the duties performed by the employee.  See Torres-Martinez v. P.R. Dep't. of Corr., 485 F.3d 19, 24-25 (1st Cir. 2007); see also Rosado De Velez v. Zayas, 328 F. Supp. 2d 202, 212 (D.P.R. 2004).  Where a plaintiff does not contend that she was terminated, but rather contends that she was demoted or her compensation was diminished, Puerto Rico law will not afford her a constitutionally protected property interest.  See Rodriguez-Pinto v. Tirado Delgado, 798 F. Supp. 77, 84 (D.P.R. 1992), aff'd on this ground, 982 F.2d 34, 41 (1st Cir. 1993) (finding that an employee's potential for salary increase does not constitute a property right); see also Morales-Narvaez v. Rossello, 852 F. Supp. 104, 113 (D.P.R. 1994) (summarizing cases holding that a plaintiff is not deprived of a property interest by a change in duties or title).

In the present case, Plaintiff was reclassified to the position of Principal Attorney when her position as the AFSI was eliminated from the agency.  While the Principal Attorney position might have fewer opportunities for advancement in salary and rank, the fact remains that Plaintiff's working conditions in terms of salary and fringe benefits remained unchanged.  Equally unconvincing is Plaintiff's contention that because the duties assigned to the position of Principal Attorney are markedly inferior to the duties she had as the ASFI, her change in position is protected by the Due Process Clause.  This argument has continually been held insufficient to constitute a recognized property interest.  Since Plaintiff's allegations in this case do not involve the termination of her employment, but merely a change in her functions, Plaintiff has not been

Civil No. 13-1915 (GAG)

deprived of any legally cognizable property interest, even if the Defendants' alleged actions would constitute an adverse employment action.

Accordingly, the court **GRANTS** Defendants' motion for summary judgment in regards to Plaintiff's claim under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

B.  Political Discrimination

Next, Defendants move for summary judgment on Plaintiff's political discrimination claim, specifically asserting Plaintiff has not suffered an adverse employment action, and thus, has failed to meet the First Circuit's *prima facie* case. (Docket No. 60 at 6-13.)

The First Amendment to the United States Constitution embodies the right to be free from political discrimination.  Barry v. Moran, 661 F.3d 696, 699 (1st Cir. 2011).  The First Circuit has held such right prohibits government officials from "taking adverse action against public employees on the basis of political affiliation, unless political loyalty is an appropriate requirement of the employment." Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 11 (1st Cir. 2011) (internal citations omitted).

1.  Plaintiff's Prima Facie Case

A *prima facie* case of political discrimination based on the First Amendment consists of four elements: "(1) that the plaintiff and defendant have opposing political affiliations, (2) that the defendant is aware of the plaintiff's affiliation, (3) that an adverse employment action occurred, and (4) that political affiliation was a substantial or motivating factor for the adverse employment action." Lamboy-Ortiz v. Ortiz-Vélez, 630 F.3d 228, 239 (1st Cir. 2010).

The Plaintiff "must point 'to evidence on the record which, if credited, would permit a rational fact-finder to conclude that the challenged personnel action occurred and stemmed from a

Civil No. 13-1915 (GAG)

politically based discriminatory animus.'" Gonzalez-De-Blasini v. Family Dept., 377 F.3d 81, 85 (1st Cir. 2004) (quoting LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996)). Additionally, the plaintiff "must make a fact-specific showing that a causal connection exists between the adverse treatment and the plaintiff's political affiliation." Aviles-Martínez v. Monroig, 963 F.2d 2, 5 (1st Cir. 1992) (citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 58 (1st Cir. 1990)).

If the plaintiff proves his *prima facie* case, the burden shifts to the defendant to articulate a non-discriminatory ground for the adverse employment action and establish, by a preponderance of the evidence, that the same action would have been taken regardless of the plaintiff's political beliefs – also known as the Mt. Healthy Defense. Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977). In response, "the plaintiff may discredit the proffered nondiscriminatory reason, either circumstantially or directly, by adducing evidence that discrimination was more likely than not a motivating factor." Padilla-Garcia v. Guillermo Rodríguez, 212 F.3d 69, 77 (1st Cir. 2000). In the end, "[s]ummary judgment is warranted 'only if defendants' evidentiary proffer compelled the finding that political discrimination did not constitute a "but for" cause for the adverse employment action.'" Mendez-Aponte v. Puerto Rico, 656 F. Supp. 2d 277, 285 (D.P.R. 2009) (quoting Jirau-Bernal v. Agrait, 37 F.3d 1, 4 (1st Cir. 1994)).

As to the first prong of Plaintiff's *prima facie* case, neither party disputes that Plaintiff is a member of the NPP, and has served as an electoral polling officer for the NPP in General Elections. (Docket No. 75 ¶ 1.) It is also uncontested that Weyne is a supporter of the PDP, who was appointed by then newly elected PDP Governor Garcia-Padilla to serve as Insurance Commissioner. (Id. ¶ 27, 30.) Therefore, the first element, opposing political affiliations, is satisfied.

Civil No. 13-1915 (GAG)

With regard to the second element, courts have acknowledged that political discrimination often turns on an employer's cloaked motives that can be hard for the employee to prove. The First Circuit has continually held that circumstantial evidence can suffice to show a defendant's knowledge of a plaintiff's political party.  See, e.g., Martínez-Vélez v. Rey-Hernández, 506 F.3d 32, 44 (1st Cir. 2007) (holding that a reasonable jury could infer that the defendant was aware of the plaintiff's NPP affiliation based on testimony that the plaintiff "spoke openly about her political views and sat in the NPP portion of the de facto segregated cafeteria"); Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir. 1991) ("Given the nature of the [employees'] positions, the defendants' knowledge that the plaintiffs had originally been hired by the previous . . . administration, the timing of the moves, the identities of those consulted, the lack of any legitimate reason for ousting the incumbents, and the partisan connections of the replacement workers, it seems disingenuous to suggest that [the defendant] acted without regard to the politics of the situation.").

Here, Plaintiff submitted evidence that at the OIC, employees belonging to opposing political parties usually do not sit together during lunchtime - a type of practice which became more prevalent when Weyne assumed the position of Commissioner.  (Docket No. 75 ¶ 37.) Plaintiff also asserted that it was common knowledge at the OIC that Plaintiff belongs to the NPP and that she formerly held the trust position of Deputy Commissioner of the OIC under the administration of former NPP Governor, Fortuño-Burnet.  (Id. ¶ 38.)  Plaintiff offered evidence that employees of the Legal Division of the OIC often discuss politics, and make known to other employees where their political ties lie. Lastly and most importantly, Plaintiff has submitted uncontested evidence that on a January 3rd meeting, Weyne told Plaintiff that because Plaintiff was not of her political trust, "things would be changing."  (Id. ¶ 35.)  The court finds that the

Civil No. 13-1915 (GAG)

above is sufficient to allow a reasonable jury to infer that Weyne knew of Plaintiff's political affiliation.

Mostly at issue in this motion for summary judgment, is whether Plaintiff suffered a materially-adverse employment action to satisfy the third prong of her *prima facie* case. Under the First Amendment, an adverse employment action includes discharge and demotion, denying promotions and transfers, and failing to recall a public employee after layoffs. Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 766 (1st Cir. 2010).

A plaintiff who was demoted from a job for which a party affiliation requirement is inappropriate "may ordinarily forestall summary judgment by pointing to evidence in the record which, if credited, would permit a rational factfinder to conclude that a demotion occurred and that it stemmed from a discriminatory animus." Nereida-Gonzalez, 990 F.2d at 706.  In the present case, Defendants argue Plaintiff was not demoted because at the time of the transfer, the position of Principal Attorney had the same salary and fringe benefits as her prior position of Director of the AFSI.  (Docket No. 60 at 8.)

However, Plaintiff has pointed at evidence that would permit a rational jury to conclude that a demotion did occur, even where Plaintiff retained the same salary in the new position. The First Circuit has held that Defendants cannot argue a reclassification is a simple lateral move and not a demotion, where Plaintiff's "ability to earn more money was circumscribed." Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, 703 (1st Cir. 1993).  OIC's own regulations define a demotion as "moving an employee from a position in a class to a position in another class for which a lower minimum compensation rate has been provided."  (Docket No. 88-3 ¶ 17.)  Weyne's rearrangement of the OIC resulted in Plaintiff's position being eliminated.  Plaintiff was then returned to a job that she held 11 years ago, which is of lower rank and salary scale. The OIC's

Civil No. 13-1915 (GAG)

Director of Human Resources acknowledged she was aware that the position of Principal Attorney is a lower ranked position than the director of the AFSI.  (Docket Nos. 76 ¶ 12.)  According to the Career Service Position and Compensation Plan, the position of AFSI is comprised in the Managerial Band, Zone 2, with a monthly retribution scale that ranges from $4,000.00 to $6,205.00 and an extended monthly retribution scale that ranges from $6,516.00 to $10,108.00. (Docket No. 75 ¶ 89.)  The position of Principal Attorney is comprised in the Managerial Band, Zone 3, with a monthly retribution scale that ranges from $3,475.00 to $5,391.00 and an extended monthly retribution scale that ranges from $5,660.00 to $8,781.00.  (Id. ¶ 88.)  Thus, Plaintiff's opportunity for advancement is now reduced in her new position as Principal Attorney in terms of salary and rank.

Lastly, Plaintiff states her duties as the Principal Attorney are markedly inferior to the ones assigned to her previous position as the AFSI Director. As the AFSI Director, Plaintiff supervised and directly investigated insurance fraud. Defendants themselves assert that the AFSI director had "broad inherence over the most basic aspects of the personnel in the division in matters as critical as recruitment."  (Docket No. 60 at 20.)  Defendants also assert Plaintiff had "authority over 5-6 employees, a respectable amount in such a small agency."  (Id.)  Furthermore, Defendants recognize that as the AFSI Director, Plaintiff had "broad inherence and control over every single aspect of the investigation and processing of insurance fraud in Puerto Rico."  (Id. at 21.)  Plaintiff additionally presented evidence that many of her tasks as the AFSI Director included specific and specialized functions typical of a managerial position with great complexity and responsibility.

Plaintiff asserts, and Defendants do not contest, that as the Principal Attorney she is not assigned supervisory functions, and is not consulted with anything that has to do with the administration of the Department of Legal Affairs. Plaintiff has included evidence that she has

Civil No. 13-1915 (GAG)

been treated differently at the OIC compared to other employees, evidenced by the fact that she almost has no case load.  (Docket No. 76 ¶ 5.)

Defendants also allege Plaintiff's argument that a 30-day suspension constituted adverse employment action fails because "plaintiff admits that she incurred in the violation alleged." (Docket No. 60 at 10.)  However, as Defendants also asserts "there is no question that an unpaid suspension constitutes an adverse employment action."  (Id.; see Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 73 (2006) ("Thus, the jury's conclusion that the 37-day suspension without pay was materially adverse was a reasonable one.").  Defendants' arguments that the challenged suspension was issued after plaintiff had the opportunity to challenge it in an administrative hearing, or that Plaintiff admits that she incurred in the violation alleged, serve to establish that there was no adverse employment action, fails.  Both arguments address the merits of the suspension, rather than the question of whether a suspension constitutes an adverse employment action, which is what is truly at issue at this stage. As such, Plaintiffs have stated enough facts, from which a reasonable jury could decide an adverse employment action occurred, evidenced by a demotion.[1]

To survive the last hurdle of the *prima facie* case, Plaintiff must proffer evidence that political affiliation was a substantial or motivating factor for the adverse employment action. Lamboy-Ortiz, 630 F.3d at 239.  This prong is often described as a showing of discriminatory animus. The First Circuit has recognized that "it is rare that a 'smoking gun' will be found in a

---

[1] Defendants mistakenly argue that the "reclassification" of Plaintiff's position and the fact that she has not been removed or dismissed, or placed in an unreasonably inferior position, invokes the test formulated by the First Circuit in Agosto-de-Feliciano. See generally Agosto-de-Feliciano v. Aponte-Roque, 889 F.2d 1209, 1219 (1st Cir. 1989).  However, the Agosto-de-Feliciano framework is limited to complaints of discrimination short of demotion, thus, contrary to Defendant's assertions, it does not apply here. See Acosta-Orozco v. Rodriguez-de-Rivera, 132 F.3d 97, 101 (1st Cir. 1997).  Plaintiff, as the subject of a demotion, "which involved reductions in pay and official rank," Agosto-de-Feliciano, 889 F.2d at 1218 n. 8, need not establish that her new "work situation [is] unreasonably inferior to the norm for the position" such that "the new work conditions would place substantial pressure on even one of thick skin to conform to the prevailing political view." Id. at 1218.

Civil No. 13-1915 (GAG)

political discrimination case, and thus circumstantial evidence alone may support a finding of political discrimination." <u>Id.</u> at 240.   A court can find political affiliation as a substantial or motivating factor for an adverse employment action by drawing inferences from the context of a multitude of facts at the summary judgment stage.  <u>See</u> <u>Rodríguez v. Municipality of San Juan</u>, 659 F.3d 168, 178 (1st Cir. 2011).

Plaintiff has provided the court with sufficient evidence that present multiple issues of material facts as to whether Weyne's treatment to Plaintiff was motivated by politically based discriminatory animus, and she has alleged with specificity various instances which suggest political discrimination.  As discussed above, Plaintiff offered evidence that because Plaintiff was not of her political confidence, "things would be changing."  (Docket No. 75 ¶ 35.)  Defendant also told Plaintiff: "that is how political matters are," when Plaintiff inquired as to the reasons for ordering Plaintiff to exhaust her accrued vacation leave two or three days at a time.  (<u>Id.</u> ¶ 44.)  After she would return from her vacation days, and would be given less time to complete her tasks, Plaintiff asserts that Weyne told her in a sarcastic manner: "Are you enjoying this?"  (<u>Id.</u> ¶ 48.) Weyne would often reprimand Plaintiff through emails sent to other insurance directors, in which she copied Plaintiff.  (<u>Id.</u> ¶ 47.) Lastly, contrary to a 30-day requirement in the OIC regulations to challenge a demotion, Plaintiff was given only 5 days to challenge her demotion.  (<u>Id.</u> ¶ 79, 81.)

Additionally, Plaintiff was suspended for thirty days for using OIC's equipment to obtain Law 9 benefits in response to a lawsuit being brought against her for decisions she made while serving as deputy commissioner of the OIC.  (<u>Id.</u> ¶ 148.)  It is uncontested that Plaintiff's decision to request Law 9 benefits through the agency was common practice at the OIC, that no one had been sanctioned before for doing so, and that there are no regulations, letter or any documents in the OIC specifying the process that should be followed when requesting such benefits.  (<u>Id.</u> ¶ 149,

Civil No. 13-1915 (GAG)

153.)   Yet, Weyne ultimately decided to impose a sanction against Plaintiff from salary and employment for thirty days.  (Id. ¶ 156).

As the AFSI Director, Plaintiff occupied a position with supervisory and coordinating functions.  As the Principal Attorney, Plaintiff was shifted to a lower rank position in a lower pay bracket, with less opportunity for advancement.  In fact, Plaintiff last held this position 11 years ago, in 2004.  Plaintiff's uncontested evidence also shows that she no longer holds supervisory authority, has barely any case load, and is not consulted with anything regarding the Legal Department.  Thus, there can be no disputing that the record contains evidence sufficient for a reasonable jury to find that a demotion occurred, and such demotion could have stemmed from political discrimination.

On this mostly uncontested record, a reasonable jury, drawing inferences favorable to Plaintiff and making credibility determinations in her favor, could easily conclude that Defendants acted out of discriminatory animus.  Looking at the evidence in the light most favorable to Plaintiff, a reasonable jury could certainly find that Plaintiff's relationship to the NPP was a substantial or motivating factor for the adverse employment action. Consequently, the court finds that Plaintiff has proffered sufficient *prima facie* evidence of political discrimination.

2.  Mt. Healthy Defense

Accordingly, the burden shifts to the Defendants to provide a non-discriminatory reason for Plaintiff's transfer to the Principal Attorney position.  Under the Mt. Healthy defense, Defendants must articulate a nondiscriminatory ground for the adverse employment action and establish, by a preponderance of the evidence, that the same action would have been taken regardless of the plaintiff's political beliefs. Mt. Healthy, 429 U.S. at 287.

Civil No. 13-1915 (GAG)

In the present case, Defendants assert that the AFSI Division and the MC Division were simply merged for efficiency purposes. (Docket No. 60-2 ¶ 1.)  Weyne maintains that she legitimately relied on a memorandum prepared by the HR Division that contained recommendations regarding Plaintiff's position, and that moving Plaintiff to the position of Principal Attorney was only done because it was the best position they had available for her. (Docket No. 75-2 at 9.)  Defendants also maintain that Plaintiff's transfer stemmed from an effort to maximize agency resources, and this decision was not influenced by political matters. (Docket No. 75-10 at 19 ¶ 3.)  Weyne stated she had decided to demote Plaintiff in 2013, after consulting with Human Resources regarding what to do with the AFSI Division.  (Docket No. 60-1 ¶ 14-15.) Thus, the court finds that Defendants have met their burden to establish non-discriminatory reasons for the transfer to the Principal Attorney Position.

3.  Pretext

Nevertheless, the purported non-discriminatory ground can still be discredited if a plaintiff demonstrates its pretextual character. Plaintiff can show that Defendant's "offered explanation is unworthy of credence." Acevedo-Diaz v. Aponte, 1 F.3d 62, 67 (1st Cir. 2011).  "The evidence by which the plaintiff establish her prima facie face may suffice for a fact-finder to infer that defendant's reason is pretextual and to effectively check summary judgment."  Padilla-Garcia v. Rodriguez, 212 F.3d 69, 78 (1st Cir. 2000).

As established above, Plaintiff has presented much more than the mere fact that she was demoted by a supervisor of another party.  Defendant's conduct and comments cast serious doubts on her assertion that politics did not play any role in her decision to transfer Plaintiff to the Principal Attorney position.  Such evidence could reveal a showing of discriminatory animus

Civil No. 13-1915 (GAG)

directly at odds with Defendant's non-discriminatory reasons for this decision, which require credibility determinations appropriate for the jury to decide on.

Thus, Defendant's motion for summary judgment as to Plaintiff's political discrimination claim is **DENIED** because Plaintiff has successfully presented enough evidence to establish such claim.

C. The Changeover Defense

Defendants next invoke the changeover defense. The First Circuit expanded on the changeover defense relying on a recently elected official's prerogative to make politically neutral changes to its departments after careful study of existing personnel. Agosto-de-Feliciano, 889 F.2d at 1220-21. There are two aspects to the changeover defense. The first recognizes that:

> In order to best accomplish its policy goals, a new administration may substantially reorganize the structure of one or more departments, it may readjust departmental priorities, or it may initiate early new procedures for carrying out its functions. The changeover in government is thus likely to produce substantial alterations in certain employee's jobs not because those employees are members of the outgoing party but because the incoming party, as a matter of policy, does not view those jobs to be important. . . . [A]n incoming administration must be given ample room to effect this sort of change without the fear of triggering a multitude of lawsuits by employees whose jobs have changed. Therefore . . . the factfinder should give some deference to a new government's explanation of how changes made shortly after it assumed power fit into its overall policy objectives.

Id. at 1221.

The second aspect expands the Mt. Healthy defense. Defendants here can state non-political reasons for their actions. A "shift in duties based on political affiliation could be proper where the employer can show a reasonable basis for believing that such an employee would likely be more helpful in implementing the new policies than an employee who is a member of an opposing political party." Id.

Civil No. 13-1915 (GAG)

However, the First Circuit explained that "deference to the government's explanation of its actions does not mean abdicating the responsibility to determine whether the new administration's changes were in fact made to further the effective implementation of its policies." Id.  In making changes the "new administration cannot cloak political discrimination merely by labeling the change a legitimate reorganization." Borges Colon v. Roman-Abreau, 438 F.3d 1, 6 (1st Cir. 2006).  The plaintiff will still have an opportunity to "demonstrate that the government's asserted justification is simply a pretext." Agosto-de-Feliciano, 889 F.2d at 1221.

In the present case, Defendants first assert that the changeover defense should apply to Weyne's decision to reorganize the structure of the agency in a way that best fit her policy goals as member of the cabinet of the newly elected administration.  Defendants argue that the elimination of the AFSI as a separate unit was not the only change made in Weyne's reorganization of the OIC.  According to Defendants, the reorganization affected other departments such as the commissaries of administrative services and customer services, along with the merging of the AFSI and the MC divisions.  (Docket No. 60-1 ¶ 12.)  Furthermore, Weyne asserts that she made many other changes in terms of moving personnel to where she understood they would be more useful.  (Id. ¶ 14-15.)  Weyne claims she began to assess a possible consolidation of the AFSI and MC division in April 2013, and she discussed this plan with others in the agency and even relied on recommendations by the HR Department to effectuate those changes.  (Id. ¶ 17.)  Specifically to the decision to move Plaintiff to the Principal Attorney position, Weyne stated that the only criterion taken into consideration was that based on Plaintiff's experience, that was the best position that they had available for her. (Docket No. 75-2 at 9.)  Defendants further assert there is no evidence in the record to show that Weyne's restructuration was anything but bona fide.

Civil No. 13-1915 (GAG)

Still, Plaintiff must still be given the opportunity to show Defendants' proffered reasons are simply pretextual.  In the present case, Plaintiff counters that there is proof of political discrimination, evidenced by the fact that Weyne's reorganization was simply a means to achieve Plaintiff's demotion since she was the highest ranking NPP official left from the previous NPP administration.  Plaintiff offered deposition testimony by the HR Director, who stated that Plaintiff was the only career employee adversely affected with a demotion to a position of lower rank and salary range as a result of Weyne's reorganization.  As stated above, Plaintiff alleges that Weyne told her because they were from different political parties, "things would be changing."  (Docket No. 75 ¶ 35.)  Plaintiff also offers evidence that while Weyne asserts there was a major reorganization at the OIC, the HR director admitted in deposition that the only major change in the organizational structure had been the consolidation of the AFSI unit with the MC division.  (Docket Nos. 76 ¶ 12.)  Plaintiffs assert that even though Weyne claims that she was refocusing and maximizing the agency's resources, all the other employees that were transferred from the AFSI unit to the MC division retained the same positions and duties as before, while Plaintiff was demoted to a position she last held eleven years ago.  (Docket No. 75 ¶ 86.)

Thus, the court finds Plaintiff has offered enough evidence from which a reasonable jury could infer Defendants' arguments in regards to the changeover defense are simply pretextual. Defendants' use of the changeover defense is also troubling when Defendants have maintained throughout this litigation that the decision to transfer Plaintiff to the Principal Attorney position had "absolutely nothing to do with partisan politics."  (Docket No. 75-10 at 19 ¶ 3.)  Thus, the changeover defense does not apply and summary judgment on this ground is **DENIED**.

Civil No. 13-1915 (GAG)

D.  Elrod-Branti Exception

Lastly, Defendants claim that Plaintiff's position as AFSI Director was not constitutionally protected from political patronage under the Elrod-Branti doctrine.  The Elrod-Branti doctrine provides that government officers are allowed to remove or demote employees based on their political affiliation when political affiliation is an "appropriate requirement for the effective performance of the public office involved."  Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (citing Branti v. Finkel, 445 U.S. 507, 518 (1980)); see generally Elrod v. Burns, 427 U.S. 347 (1976).   Although obviously fact-intensive, the ultimate determination whether a government position is "political" presents a question of law for the court, rather than an issue of fact for the jury. Ortiz-Pinero v. Rivera-Arroyo, 84 F.3d 7, 12 (1st Cir. 1996).

In Jimenez-Fuentes v. Torres Gaztambide, 807 F.2d 236, 241 (1st Cir. 1986), the First Circuit established a two-pronged test to identify those positions under the Elrod-Branti analysis for which political patronage is permissible.

First, the court must determine the overall functions of the employee's position, namely whether it entails "decision making on issues where there is room for political disagreement, goals or their implementation."  Jimenez-Fuentes, 807 F.2d at 241-42.  The key question is whether the position at issue, no matter how policy influencing or confidential it may be, relates to partisan political interests.  Id.  In the present case, Defendants have the burden to prove that "the agency employing the plaintiff handle[s] matters potentially subject to partisan political differences," and that Plaintiff's position as the AFSI Director gave her the opportunity to "influence the resolution of such matters."  Id.  (citing Mendez-Palou v. Rohena-Betancourt, 813 F.2d 1255, 1258 (1st Cir. 1987)).  Under Puerto Rico law, the classification of a position as

Civil No. 13-1915 (GAG)

"career" rather than "trust" position is relevant, although not dispositive.  Roldan-Plumey v. Cerezo-Suarez, 115 F.3d 58, 64-65 (1st Cir. 1997).

Second, the court must analyze the particular responsibilities of the employee's position to determine whether it resembles that of "a policymaker, privy to confidential information, a communicator, or some other office holder whose functions is such that a party affiliation is an equally appropriate requirement."  Jimenez-Fuentes, 807 F.2d at 242.  Courts look at the formal job description, and will focus on "the essential attributes of the position itself."  Galloza, 389 F.3d at 30.  The main factors a court will consider include:

> [T]he relative compensation level for the position, the technical expertise (if any) required to do the job, the extent to which the position involves supervision and control over others, the degree to which the position confers authority to speak in the name of higher-ups who themselves are policymakers, the influence of the position over programs and policy initiatives, and the public perception of what the position entails.

Id. at 29-30.

Courts should also analyze whether the position has any relation to elected officials, party leaders, and partisan politics.  Id.  The crux of the court's inquiry is not whether the *performed* duties satisfy the Elrod-Branti doctrine, but rather, if the *inherent* functions of her position, whether they were performed or not, justify political patronage, warranting her removal for political reasons.  See Ortíz-Pinero, 84 F.3d. at 12.

Only if the "first inquiry is satisfied" will the court then examine whether the particular job description shows the position to be that of a policymaker.  See Jimenez-Fuentes, 807 F.2d at 242.  "The first prong of the Jimenez-Fuentes test is not met unless plaintiff's particular position . . . is politically sensitive."  Berrios-Cintron v. Cordero, 976 F. Supp. 110, 115 (D.P.R. 1997); see also Fontane-Rexach, 878 F.2d at 1494 ("If the state actors cannot satisfactorily answer this initial inquiry, the ball game is over.").

28

Civil No. 13-1915 (GAG)

In the present case, Defendants have failed to meet their burden to show that Plaintiff's former positions as the AFSI Director involved decision-making on issues that relate to partisan political interests or concerns. In fact, it is uncontested that party affiliation is not an appropriate requirement for the position of AFSI Director.  (Docket No. 75 ¶ 8.)

Still, Defendants assert that the AFSI "dealt with the highly-sensitive issue of insurance fraud, a matter over which political parties may certainly have differing views as far as to what should be done to prevent/remedy its occurrence."  (Docket No. 60 at 21.)  Defendants further argue that Plaintiff was in a position to hinder or impair the new administration's policies in that area. Yet, Defendants have not pinpointed any particular issues that the AFSI Director would have had as a responsibility that actually related to partisan political interests or that Plaintiff had the opportunity to influence such tasks with her political views.

Lastly, Weyne herself noted that "the area of preventing, policing and sanctioning insurance fraud [] seem[s] at first glance, to be divorced from partisan politics concerns." (Docket No. 60 at 21.) While the First Circuit has cautioned against taking an "unduly myopic view" of the role politics might play in any inherent position, O'Connor v. Steeves, 994 F.2d 905, 910 (1st Cir. 1993) (citing Tomczak v. City of Chicago, 765 F.2d 633, 641 (7th Cir. 1985), cert. denied, 474 U.S. 946 (1985)), where the First Circuit has established a position is protected from political patronage, it is often because the agency itself is political in nature and the particular defendants were able to show the position at issue had the power to influence political determinations within the office.  See, e.g., Galloza, 389 F.3d at 30-31 (holding that a municipal tax collector's responsibilities entailed matters that could be prejudiced by political influences because the "agency had the discretion to affect the assessment of taxes and the distribution of the amounts that are collected," which greatly increases "the potential for partisan divergence.");

Civil No. 13-1915 (GAG)

Alfaro de Quevedo v. De Jesus Schuck, 556 F.2d 591, 592-93 (1st Cir. 1977) (reasoning the position of Director of the Office of Criminal Justice was not protected from political patronage because the officeholder was required to advise the Secretary of Justice in pending matters related to crimes and law enforcement, and had broad discretion to carry out policy in a highly controversial area).  Such is not the case here.

The AFSI Division is not a position in which there is room for political disagreement. The AFSI Division is in charge with detecting and investigating insurance scams and violations of the Insurance Code of Puerto Rico.  It is undisputed that the position of Director of the AFSI Division has always been classified in the OIC as a career position, rather than a trust/confidential position.  Furthermore, the AFSI Director worked under the supervision of the Auxiliary Commissioner of Supervision and Compliance, who gives out specific instructions for the performance of her work.  Thus, Plaintiff seemed to have had little room in the formulation or implementation of policy matters.  Because Defendants have simply failed to show that the AFSI Director position is politically sensitive, the chess match is over.

Although failure to meet the first step of the Jimenez-Fuentes test will effectively foreclose the Elrod-Branti defense, it is important for the qualified immunity analysis to determine whether Defendants have met the second prong of the test.  At this point in the process, the court will look at the job description and particular job responsibilities to determine if the position at issue resembles that of a policymaker, for which party affiliation should be an appropriate requirement.  Jimenez-Fuentes, 807 F.2d at 242.

As the AFSI Director, Plaintiff directed and supervised the Special Antifraud Unit and supported other units that investigate insurance company and possible violations under the Puerto Rico Insurance Code.  She could substitute for the Deputy Commissioner if required, and

Civil No. 13-1915 (GAG)

had to plan, coordinate and supervise work of the unit in order to prepare studies and conduct investigations.  Her position retained a monthly salary of $7,543 and she was instructed to exercise initiative and individual judgment in the performance of his or her duties.  All of these factors indicate that one's position involves matters that are open to discretion, which in turn, could involve policymaking.

Yet, Plaintiff's position has always been classified in the OIC as a career position, and not a trust position.  A closer look at the detailed job description – while containing broad language such as "plans," "coordinates," "supervises" – actually shows that most of her duties are mechanical and detailed tasks.  The majority of Plaintiff's duties deal directly with the investigation of fraud under the Puerto Rico Insurance Code.  She is tasked with specific responsibilities such as analyzing relevant data, maintaining assigned investigation files in a confidential and organized matter, and preparing investigation reports.  Even Plaintiff's duties regarding communications with outside parties, only deal with possibly testifying in administrative, civil and criminal hearings and proceedings regarding the insurance fraud investigative process.  The ASFI Director, while possibly in a position that could involve confidential analysis, internal supervising, and communicative opportunities, is hence, both enabled and constrained by the limits of her specialized functions.

Additionally, Plaintiff's job did not involve advising any high-ranking trust personnel at the office.  Nor did she have the responsibility to act as a liaison with the public, government agencies, or policy makers in regards to any discretionary manner that would have a bearing on the handling of insurance fraud in the office.  Any contact with federal, local and state agencies, seems to have happened only for the purpose of assisting her in the investigation of insurance fraud, but not in a context where the ASFI director would act as a public spokesperson for a

Civil No. 13-1915 (GAG)

representative of her agency.   Plaintiff's position, from an objective perspective, does not have room to influence public perception, to have any contact with elected officials, or to respond to partisan politics.

In light of the evidence provided by Defendants, the court concludes that the overall functions of Plaintiff's position, as established by her job description, no matter how policy-influencing or confidential Defendants allege it to be, does not relate to any "partisan political interests." Branti, 445 U.S. at 519.  Thus, Plaintiff's position, in this court's opinion, is simply a career position protected from political patronage.[2]

E.  Qualified Immunity

Lastly, Defendants assert Weyne is entitled to qualified immunity.[3]  Qualified immunity "provides a safe harbor for public officials acting the color of state law who would otherwise be liable under 42 U.S.C. § 1983 for infringing the constitutional rights of private parties." Borges Colon v. Roman-Abreu, 438 F.3d 1, 18 (1st Cir. 2006) (quoting Whitfield v. Melendez-Rivera, 431 F.3d 1, 6 (1st Cir. 2005)).  The First Circuit applies a three-part test to determine whether a public official is entitled to qualified immunity, asking "(1) whether plaintiff's allegations, if true, establish a constitutional violation; (2) whether that right was clearly established at the time of the alleged violation; and (3) whether a similarly situated reasonable official would have

---

[2] It is Defendants' burden, as the moving party, to come forth at the summary judgment stage with all evidence supporting their Elrod-Branti defense. Thus, they will now not be entitled to a second turn at bat. Consequently, at trial, the jury will be informed that Plaintiff's position was a career one.

[3] In Plaintiff's opposition to Defendants' Motion for Summary Judgment, (Docket No. 83), Plaintiff argued the qualified immunity defense has been waived because Defendants failed to raise it in their initial responsive pleading. Defendants then sought leave of court to amend their answer to the complaint for the sole purpose of asserting the qualified immunity defense, which had not been pleaded in their answer. (Docket No. 92). This Court ruled Defendants' qualified immunity claim had not been waived, pursuant to the First Circuit's decision in Guzmán-Rivera, holding the defense can be raised for the first time at the pre-trial stage via motion for summary judgment after discovery had concluded, even if Defendant had failed to raise it previously. Guzman-Rivera v. Rivera Cruz, 98 F.3d 664, 668 (1st Cir. 1996). Thus, the court denied Defendants' request for leave to amend the answer to the complaint to assert said defense because Defendants had not waived it. Lopez-Erquicia v. Weyne-Roig, CIV. 13-1915 GAG, 2015 WL 3369763, at *3 (D.P.R. May 26, 2015). The court will now reach the merits of Defendants' qualified immunity claim.

Civil No. 13-1915 (GAG)

understood that the challenged action violated the constitutional right at issue." <u>Guillemard-Ginorio v. Contreras-Gomez</u>, 490 F.3d 31, 38 (1st Cir. 2007) (quoting <u>Mihos v. Swift</u>, 358 F.3d 91, 102 (1st Cir. 2004)).  If all three questions are answered in the affirmative, then qualified immunity is not available. <u>Mihos</u>, 358 F.3d at 110.

First, Plaintiff alleges that Weyne demoted her to the position of Principal Attorney because she was not of her political trust.  This allegation, if true, would clearly establish a constitutional violation because as established above, First Circuit precedent holds that adverse employment actions based on political affiliation or opinion violate the First Amendment. <u>See Gonzales-Pina v. Rodriguez</u>, 407 F.3d 425, 431 (1st Cir. 2005).

Second, the right to be free from political discrimination was clearly established when Plaintiff was demoted in 2013.  A reasonable official should have known that demoting Plaintiff because she was not of "her political trust" would violate Plaintiff's constitutional right to be free from political discrimination.  Defendants concede that the right to be free from political discrimination is beyond clearly established.  However, Defendants argue that the First Circuit has steadfastly extended qualified immunity within the political discrimination gambit, where a government official is required to determine if an employee falls within the <u>Elrod-Branti</u> exception.  Defendants argue this is an area in which government officials must have enough room to make reasonable judgment calls.  Thus, Weyne should be afforded qualified immunity because a reasonable official in her position that examined the position of AFSI Director could conclude such position was not protected against political patronage.

In analyzing Defendants' claim, the question is not whether the <u>Elrod-Branti</u> doctrine applies, but whether, at the time the demotion happened, "it was clearly established that employees in the particular positions at issue, in light of the responsibilities inherent in those positions, were

Civil No. 13-1915 (GAG)

protected from patronage dismissal." Mendez-Palou, 813 F.2d at 1259.  The court will focus on the reasonableness of Defendants' actions and not on what the Defendant may or may not have known at that time.  Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982).  While this question is one of objective reasonableness, the grant of summary judgment based on qualified immunity is not appropriate where there are factual issues as to the essential element of plaintiff's claim that bears directly on the determination of the objective reasonableness of Defendant's actions.  See Swain v. Spinney, 117 F.3d 1, 10 (1st Cir. 1997) ("The ultimate question of whether a reasonable police officer, on the basis of information known to him, could have believed his actions were in accord with constitutional rights is a question of law, subject to resolution by the judge not the jury. But if there is a factual dispute, that factual dispute must be resolved by a fact finder.").  Additionally, the officer's action must be analyzed under an "objective good faith" standard.  See Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 830 (1st Cir. 1987).

Looking at the record, Defendants cannot legitimately claim to have been objectively reasonable in thinking Plaintiff could lawfully be discharged because of her political affiliation, specifically when the position of Director of the AFSI Division has always been classified in the OIC as a career position.  The court recognizes that a reasonable officer could mistakenly judge whether an employee falls within the Elrod-Branti exception, and in this case, Weyne could have done so because some of Plaintiff's duties indicate that her position could involve matters that are open to discretion, which in turn, could involve policymaking.  However, Plaintiff has presented ample evidence in this case from which a jury could find that Weyne did not miss the mark in good faith.  As established above, there are factual issues as to Weyne's conduct, as well as to her motivations behind transferring Plaintiff to the Principal Attorney position.  These factual issues should be properly submitted to a jury.  At this stage, Plaintiff is afforded all reasonable inferences

Civil No. 13-1915 (GAG)

in her favor, and a reasonable juror could find that Weyne knew or should have known that her conduct violated clearly established constitutional rights to be free from political discrimination and Plaintiff's position was protected from political patronage.  Thus, the motion for summary judgment based on qualified immunity is **DENIED**.

    F.  <u>State Law Claims</u>

The Constitution of Puerto Rico gives Plaintiff the same Due Process rights as the U.S. Constitution.  <u>See</u> <u>Nazario v. Dept. of Health of Cmmw. of Puerto Rico</u>, 415 F. Supp. 2d 48, 49 n. 2 (D.P.R. 2006) ("A reading of [Puerto Rico Supreme Court decisions on Due Process] reveals that, insofar as Due Process is concerned, both state and federal constitutions afford an individual the same protections against actions by the State. More so, the Puerto Rico Supreme Court's analysis of Due Process in its opinions revolves around leading United States Supreme Court decisions on said matter.").

Because this court has decided to **GRANT** Defendant's motion for summary judgment as to Plaintiff's federal Due Process claim, Plaintiff's supplemental state law claim under Article II, Section 7 of the Constitution of Puerto Rico, is also **DISMISSED** with prejudice.

However, given that Plaintiff's political discrimination claim survived Defendants' motion for summary judgment, the court **DENIES** Defendants' motion for summary judgment as to the remaining state law claims.[4]

**V.**   **Conclusion**

For the reasons stated herein, the court **GRANTS in part and DENIES in part** Defendants' motion for summary judgment (Docket No. 60.) The court **GRANTS** Defendants'

---

[4] Additionally, in their motion for summary judgment, Defendants simply included a blanket statement indicating they were moving for summary judgment on all "claims." (Docket No. 60 at 2). Nevertheless, Defendants' motion failed to address some of Plaintiff's claims under Puerto Rico law, specifically the claims under Articles 1802 and 1803 of the Civil Code, P.R. LAWS ANN. tit. 31, §§ 5141 and 5142. Thus, those claims also remain.

**Civil No. 13-1915 (GAG)**

motion for summary judgment in regards to Plaintiff's claim under the Due Process Clause of the Fourteenth Amendment, and Article II, Section 7 of the Constitution of Puerto Rico. The court **DENIES** Defendants' motion for summary judgment in regards to Plaintiff's claims under the First Amendment, and state law claims alleging violations of Article II, Section 1, 2, 4, and 6, and Articles 1802 and 1803 of the Civil Code, P.R. LAWS ANN. tit. 31, §§ 5141 and 5142.

      **SO ORDERED.**

      In San Juan, Puerto Rico this 14th day of September, 2015.

                           *s/ Gustavo A. Gelpí*
                           GUSTAVO A. GELPI
                      United States District Judge